847 So.2d 438 (2003)
Jason Dirk WALTON, Appellant,
v.
STATE of Florida, Appellee.
Jason Dirk Walton, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC78070, SC76695.
Supreme Court of Florida.
May 29, 2003.
*441 Pamela H. Izakowitz, Capital Collateral Regional CounselSouth, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Kimbery Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.

*442 REVISED ON REHEARING
PER CURIAM.
The opinion issued in this case on February 27, 2003, is withdrawn, and the following revised opinion is substituted in its place. Jason Dirk Walton appeals a final order of the Circuit Court of the Sixth Judicial Circuit (Downey, J.) denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. This appeal is accompanied by a petition for a writ of habeas corpus. We have jurisdiction under article V, section 3(b)(1) and (9) of the Florida Constitution.

Facts and Procedural History
On April 6, 1983, Jason Dirk Walton was indicted by a Pinellas County, Florida grand jury and charged with three counts of murder in the first degree. The facts surrounding the instant case are described in detail in the opinions of this Court addressing Walton's direct appeals. See Walton v. State, 481 So.2d 1197 (Fla.1985) ("Walton I"); Walton v. State, 547 So.2d 622 (Fla.1989) ("Walton II"). Walton pled not guilty and the case proceeded to trial. At the conclusion of the trial, the jury recommended that Walton be sentenced to death for each of the three murders, and the judge followed the jury's recommendation.
An appeal was taken to this Court, and Walton's convictions were affirmed. However, this Court vacated Walton's death sentences because the State improperly used hearsay accounts during the penalty phase. Therefore, a new penalty proceeding was ordered. See Walton I, 481 So.2d at 1200. Following Walton's second penalty proceeding, the jury again recommended three death sentences, each by a vote of nine to three. The trial court reimposed the death sentences, and on appeal, this Court affirmed. See generally Walton II, 547 So.2d at 623.
Walton's petition for certiorari was denied by the United States Supreme Court on January 8, 1990. See Walton v. Florida, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). Shortly thereafter, a request by Walton for clemency was denied when Governor Bob Martinez signed a death warrant ordering Walton's execution on September 24, 1990. Subsequently, Walton's execution was stayed by order of this Court which allowed him to file a motion for postconviction relief under rule 3.850 by December 15, 1990. Walton timely filed such a motion attacking the validity of his convictions and sentences. Following a hearing on Walton's ineffective assistance of counsel claims, Judge Brandt C. Downey III entered oral findings into the trial record and later formally denied Walton's motion in a written order. Walton appealed, and this Court reversed on the grounds that Walton was entitled to an evidentiary hearing to address the alleged failure of the State to produce certain public records. See Walton v. Dugger, 634 So.2d 1059 (Fla.1993).
This Court relinquished jurisdiction to the trial court to facilitate document production under Walton's public records requests and to allow for an evidentiary hearing on any claims resulting therefrom. See id. at 1062. Pending resolution of the public records claim, this Court reserved ruling on the remaining issues raised on appeal by Walton.[1]
*443 An evidentiary hearing on Walton's ineffective assistance of counsel claims was held on February 25 and 26, 1991. Following the conclusion of that hearing, the trial judge entered extensive findings into the record, and explicitly denied relief in a subsequent written order. Walton now appeals, reasserting his original claims and raising additional issues based upon evidence adduced at the evidentiary hearing.[2] Walton has also filed a petition for writ of habeas corpus, alleging ten bases for relief.[3]

Analysis
In the first of Walton's claims warranting discussion,[4] he asserts that the *444 trial court presiding over his resentencing proceedings improperly and unconstitutionally instructed the jury as to the aggravating factors they could consider in making their recommendation.[5] Walton's resentencing jury was instructed on the aggravators of prior commission of a violent felony; commission of the murder while engaged in a robbery; commission for the purpose of avoiding or preventing a lawful arrest; commission for financial gain; that the crime was especially wicked, evil, atrocious or cruel (HAC); and commission in a cold, calculated, and premeditated manner (CCP). The record reflects that the trial court instructed the jury in the following manner:
The aggravating circumstances you must consider are:
One, that the defendant has been previously convicted of another capital offense or of a felony involving the use of violence to some person.
Two, that the crime for which the defendant is to be sentenced was committed while he was engaged in or an accomplice in the crime of burglary or robbery.
Three, the crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or affecting an escape from custody.
Four, the crime for which the defendant is to be sentenced was committed for financial gain.
Five, the crime for which the defendant is to be sentenced was especially wicked, evil, atrocious, or cruel.
Six, the crime for which the defendant is to be sentenced was committed in a cold, calculated, and premeditated manner without any pretense or [sic] moral or legal justification.
Following this set of instructions, the trial court gave a brief description of premeditation only, and did not inform the jury of any further narrowing requirements necessary to prove the existence of these aggravating factors.
The instructions given the jury in the instant case violated the precepts of the United States Supreme Court's Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), decision. In Espinosa, the Supreme Court held that "an aggravating circumstance is invalid ... if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." 505 U.S. at 1081, 112 S.Ct. 2926. The Court then proceeded to declare the precise "especially wicked, evil, atrocious, or cruel" instruction given Walton's jury in the instant case invalid under the Eighth Amendment to the U.S. Constitution. See id. at 1082, 112 S.Ct. 2926.
Further, our decisions certainly require much more extensive instruction than was given in the instant case for application of the CCP aggravator. See, e.g., Jackson v. State, 648 So.2d 85, 89 (Fla.1994) (holding that proper application of the CCP aggravator requires proof "that the killing was the product of cool and calm reflection and not an act prompted by an emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged *445 design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.") (citations omitted).
Because the instructions were clearly insufficient under the United States Supreme Court's, as well as this Court's, jurisprudence governing instructions designed to narrow the class of defendants constitutionally eligible for the death penalty, it is necessary for this Court to assess whether Walton should be granted retroactive relief. In the postconviction procedural setting before us today, it is dispositive that the defense did not register an objection to the jury instructions at trial. Because no objection was interposed during Walton's resentencing proceedings, Walton is foreclosed from claiming relief under Espinosa, as well as our decisions requiring more comprehensive jury instructions. This bar to requesting retroactive relief based upon subsequent changes in the law was set forth by this Court in a clear fashion in James v. State, 615 So.2d 668 (Fla.1993). In James, we held: "Claims that the [jury] instruction ... is unconstitutionally vague are procedurally barred unless a specific objection on that ground is made at trial and pursued on appeal." Id. at 669. In James, we concluded that the defendant's challenge to the heinous, atrocious, or cruel aggravator was not barred, because he objected at trial, while his challenge to the cold, calculated, and premeditated jury instruction was barred because James failed to register an objection thereon during the trial. See id.; see also Clark v. Dugger, 559 So.2d 192, 193-94 (Fla.1990) (holding that "an objection at trial is necessary to trigger... retroactivity"); Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989) (same). Clearly, Walton's claim to relief under Espinosa is barred. No objection to the jury instructions was registered at trial, no claim regarding the instructions was raised on Walton's direct appeal, and none of the decisions upon which Walton now relies mandate retroactive application of their holdings. Indeed, "if punishment is ever to be imposed for society's most egregious crimes, the disposition of a particular case must at some point be considered final notwithstanding a comparison with other individual cases." Witt v. State, 387 So.2d 922, 927 (Fla.1980). Walton's claim asserting an entitlement to a new trial based upon improper jury instructions is barred.
Walton's claims that his trial counsel and appellate counsel should have anticipated the above-cited jury instruction decisions are without merit. Because the Espinosa decision was delivered by the United States Supreme Court in 1992, and refinement of Florida's jury instructions by this Court began thereafter, trial and appellate counsel cannot be faulted for failing to assert claims that did not exist at the time they represented Walton. This Court has consistently held that trial and appellate counsel cannot be held ineffective for failing to anticipate changes in the law. See, e.g., Nelms v. State, 596 So.2d 441, 442 (Fla.1992); Stevens v. State, 552 So.2d 1082, 1085 (Fla.1989).
Walton next contends that his fundamental rights to confrontation, due process, and an individualized and reliable hearing were violated when Dr. Sidney Merin was allowed to testify at his postconviction evidentiary hearing. Because Merin was previously appointed as a confidential mental health expert to Richard Cooper, Walton's codefendant, Walton contends that the obvious conflict of interest violated his constitutional rights. Additionally, Walton contends that the error in allowing Dr. Merin to testify was compounded by the trial court's limitation of *446 cross-examination regarding the doctor's conflict of interest.
It is clear that because Dr. Merin assisted in preparing Richard Cooper's defense strategy, a conflict of interest existed. Merin agreed to evaluate the new evidence before the court in the postconviction proceeding to determine what impact, if any, the mitigating evidence obtained during postconviction discovery would have upon a mental health professional's diagnosis of Walton. He testified regarding his impressions, despite having consulted with Cooper's attorneys during Cooper's prior trial proceedings. Because these two codefendants' interests were antagonistic to each other, it is unlikely that Merin could render a truly objective opinion with regard to both. Thus, it was error to allow Merin to testify as a witness for the State.
While the testimony of Dr. Merin may be questioned, it does not justify relief because no prejudice has been demonstrated by Walton. Despite Walton's assertion that the circuit court "relied upon Dr. Merin in denying relief," the transcript of the trial court's evidentiary hearing clearly refutes this claim. The only mention of Dr. Merin by the trial court when announcing its findings consisted of the following statement:
The testimony of the psychologist was there was no brain damage. Certainly it seems to me and I almostI didn't, but I almost was going to ask Dr. Merin if looking at Page 133, starting at about the middle of the page to ask Dr. Merin if someone who allegedly abused drugs as much as he did, according to what's on page 133, if it wouldn't cause permanent brain damage.
Because this is the only instance in which the trial court even mentioned Dr. Merin, it certainly did not rely upon him in reaching its sentencing conclusions. Therefore, the error committed by the trial court in allowing Dr. Merin to testify did not contribute to the trial court's final determinations. Under State v. DiGuilio, 491 So.2d 1129 (Fla.1986), the commission of an error is nonetheless harmless where "there is no reasonable possibility that the error contributed to the conviction." Id. at 1135; see also Moore v. State, 701 So.2d 545, 549-50 (Fla.1997). While it was error for the trial court to allow a mental health professional with an obvious conflict of interest to testify during the postconviction proceedings below, any error was harmless beyond a reasonable doubt because the trial court did not actually rely upon Merin's testimony in reaching its decision.
Next, Walton asserts in both his postconviction motion and his habeas corpus petition that his resentencing trial court improperly relied upon a sentencing order submitted by the State in sentencing him to death. He contends that the sentencing order contained information not before the court on resentencing, and because the trial court relied upon the State's sentencing memorandum, the trial judge improperly abdicated his sentencing responsibilities. Additionally, Walton asserts that his trial counsel rendered constitutionally ineffective assistance of counsel for failing to object to the trial court's adoption of the State's sentencing memorandum as its sentencing order.
This claim is procedurally barred. Clearly, any claims regarding the conduct of the resentencing trial judge in the creation of his sentencing order could and should have been raised on direct appeal. See Young v. State, 739 So.2d 553, 555 n. 5 (Fla.1999). Indeed, in Swafford v. Dugger, 569 So.2d 1264 (Fla.1990), this Court specifically foreclosed argument regarding the trial court's failure "to independently weigh the aggravating and mitigating factors" because "they should have been *447 raised, if at all, on direct appeal." Id. at 1267.
Even if this claim was not procedurally barred, Walton's contentions here are not supported by the record. The only evidentiary support for Walton's assertions here is the use of identical language in somewhat substantial portions of the final sentencing order and the sentencing memoranda submitted to the trial court by the State. This Court has specifically declared that trial courts must not delegate "the responsibility to prepare a sentencing order" to the State Attorney. Patterson v. State, 513 So.2d 1257, 1261 (Fla.1987). In the instant case, however, it is clear that the State simply submitted a sentencing memorandum to the trial court for its consideration, which the trial court subsequently considered before writing its sentencing order. This act alone does not constitute error. See Patton v. State, 784 So.2d 380, 388 (Fla.2000) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), for the proposition that "even when the trial court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous"). Walton does not assert that any impermissible ex parte discussions regarding the resentencing or any other wrongful acts occurred in the creation of the sentencing order.[6] Thus, because there is no evidence contained in the record supporting Walton's contention that the State created or originated the sentencing order, we find no reversible error.
As nothing in the record supports Walton's assertions that the trial court delegated its responsibility regarding preparation of the sentencing order to the State, no reversible error occurred. Therefore, Walton's claim of ineffective assistance of counsel is also without merit. See Engle v. Dugger, 576 So.2d 696 (Fla.1991); Card v. State, 497 So.2d 1169 (Fla.1986) (holding that counsel is not ineffective for failing to raise meritless claims).
In a somewhat related claim, Walton next contends that his resentencing trial was contaminated by the admission of statements from non-testifying codefendantsevidence which this Court specifically deemed inadmissible in Walton I. Specifically, Walton contends that there was no evidence before the resentencing court supporting its findings regarding Walton's purported leadership of the group, and no evidence is contained in the record regarding Walton's supposed grabbing of a victim by the hair, items noted by the trial court in its sentencing order. Finally, Walton contends that his trial counsel rendered ineffective assistance of counsel by failing to object to the trial court's findings, and his appellate counsel was ineffective because he did not raise this claim on direct appeal.
In Walton I, this Court held that the confessions of codefendants Cooper and McCoy were "the primary evidence relied on by the state in the penalty phase before the jury and that the trial judge considered the confessions in sentencing appellant to death." Walton I, 481 So.2d at 1200. For this reason, this Court vacated Walton's sentences of death and mandated a new sentencing hearing. Walton now contends that the resentencing trial court simply utilized the same information in sentencing Walton to death a second time.
*448 An examination of the record reveals that neither of the confessions used in Walton's first trial were introduced as evidence in his resentencing hearing. Additionally, as identified by the State, a large amount of evidence independent of McCoy and Cooper's confessions was before the trial court which supported the State's theory regarding Walton's role in the murders. Specifically, the trial court had before it Walton's own confession to his role in, and the planning of, the robbery; testimony by John Gray regarding statements Walton made to him describing how he had attempted to fire his pistol, but it had misfired; and the testimony of others who detailed the relative roles each perpetrator played in the crime. See Walton II, 547 So.2d at 623-24. Clearly, extensive evidence was before the trial court which supports its conclusions regarding Walton's leadership of the criminal venture which resulted in the deaths of the three victims. The evidence before the trial court during the resentencing was not the same as that deemed erroneously admitted and relied upon by this Court in Walton I.
Walton seizes upon the trial court's determination in its order that "Walton grabbed one of the victims by the hair," in an attempt to show that the entire resentencing was tainted with evidence from the previous penalty phase reversed in Walton I.[7] The State cannot identify any source for this information, and there is seemingly no record material from the resentencing proceedings which supports this statement by the trial court. While this presents questions, the inclusion of one errant phrase by the trial court in its sentencing order is not significant evidence that the trial court relied upon the original confessions of McCoy and Cooper in sentencing Walton to death. Clearly, taken in conjunction with the presence of the overwhelming evidence before the court supporting its conclusions as to Walton's leadership role in the burglary planning, this mistaken statement by the trial court within its final order was harmless. Certainly, the trial court's final sentencing decision did not hinge upon whether Walton actually placed his hands upon a victim's hair or not. Thus, this error did not contribute to Walton's sentence, and we conclude that it is harmless under State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Because the trial court had before it substantial evidence in support of the conclusions contained in its sentencing order, trial counsel was not ineffective for failing to register an objection. See Engle, 576 So.2d at 701-02; Card, 497 So.2d at 1177 (counsel is not ineffective for failing to raise meritless claims). Likewise, appellate counsel did not render constitutionally defective assistance in failing to raise this meritless claim. See id.
Walton next contends that imposition of the death penalty upon him in the instant case constitutes cruel and unusual punishment because he was prosecuted under a theory of felony murder and it was never proven that he was actually individually responsible for the deaths of the victims. Additionally, he contends that his trial counsel rendered ineffective assistance of counsel in failing to register an objection on these grounds, and that his appellate counsel rendered ineffective assistance of counsel by not arguing this claim on direct appeal.
This claim is meritless. In Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the United States Supreme Court settled the issue of what manner of participation by a defendant *449 convicted on a theory of felony murder must be shown to make the defendant constitutionally eligible for the death penalty. The Court's conclusion was concisely stated: "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." 481 U.S. at 158, 107 S.Ct. 1676.
In the instant case, there can be no doubt that Walton's participation in the felony robbery was "major." Walton planned, led, and perpetrated the robbery from start to finish. See Walton II, 547 So.2d at 623-24. Additionally, Walton was certainly indifferent to human life here Walton does not contest that he armed the group, ensured that the group was masked, and participated in the binding of the victims with duct tapeall actions which set the stage for the eventual murders. Clearly, the trial court had before it evidence which fulfills the United States Supreme Court's Tison requirements. Thus, this claim is without merit, and the ineffective assistance of counsel claims must also fail.
As his next claim, Walton asserts that this Court's vacation of codefendant Terry Van Royal's death sentences, combined with the fact that Van Royal was a triggerman, while Walton was not, renders his sentence of death disproportionate. Additionally, he contends that his appellate counsel rendered ineffective assistance of counsel for failing to raise this issue on appeal.
This Court has consistently held that "the sentence of an accomplice may indeed affect the imposition of a death sentence upon a defendant." Foster v. State, 778 So.2d 906, 922 (Fla.2000); see also Keen v. State, 775 So.2d 263, 285-86 (Fla.2000). Just as steadfastly in this situation, this Court has also held that "[d]isparate treatment of a codefendant, however, is justified when the defendant is the more culpable participant in the crime." Larzelere v. State, 676 So.2d 394, 407 (Fla.1996); see also Foster, 778 So.2d at 922; Ray v. State, 755 So.2d 604, 611-12 (Fla.2000).
As detailed above, and as related in this Court's Walton II opinion, significant evidence was introduced during Walton's resentencing proceedings showing that he was the only participant with knowledge of the victims' location, the only party with a motive to end the life of Stephen Fridella, and the leader in the planning of the robbery operation. See Walton II, 547 So.2d at 624. While Van Royal did participate in the murders, his death sentences were vacated only because the trial court in his case failed to support its sentencing with specific findings. See Van Royal v. State, 497 So.2d 625, 628 (Fla.1986).
In the postconviction proceedings below, Walton failed to introduce any evidence which would negate the findings of the resentencing court regarding Walton's leadership of the robbery/murder enterprise. Indeed, this claim is based only upon Walton's unsupported assertion that Van Royal was a triggerman, while Walton was not; therefore, he should not receive the death penalty. Because, as concluded by the resentencing court, and unrebutted by Walton, "[a]ll of the victims in the ghastly incident died as a result of gunfire brought down upon them through the leadership of the defendant, Jason D. Walton," Walton was indeed more culpable than Van Royal. Thus, under Larzelere, Walton's death sentence is entirely proper, even after Van Royal's sentence was reduced to life imprisonment.
Because Walton's death sentence was warranted by his relative culpability and leadership of the operation which caused the deaths of the three victims here, Van *450 Royal's life sentence does not make Walton's sentence disproportionate. Therefore, appellate counsel was not ineffective for failing to raise this meritless claim. See Suarez v. Dugger, 527 So.2d 190, 193 (Fla.1988) ("The failure of appellate counsel to brief an issue which is without merit is not deficient performance...."); Martin v. Wainwright, 497 So.2d 872, 874 (Fla. 1986) (same).
While admitting that this claim was presented and fully addressed in his first direct appeal, Walton contends in both his postconviction appeal and his habeas corpus petition that United States Supreme Court decisions delivered after the finality of his direct appeal require us to reconsider our Walton I decision. Walton asserts that Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), and McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), make it clear that his confession, which occurred after he had consulted with an attorney, should not have been admitted into evidence at his original trial.
In Walton I, this Court detailed and addressed this issue in the following manner:
Appellant first asserts that the trial judge erred in denying appellant's motion to suppress his two statements. Appellant acknowledges that prior to giving the statements, he had been fully advised and executed written waivers of his Miranda rights, but argues that he invoked his right to terminate questioning when he remarked, "I would like to but I don't really want to [give a statement]." Appellant contends that his subsequent statements were, therefore, obtained in violation of appellant's constitutional rights to remain silent and to have counsel present during questioning.
The record reveals that despite repeated reminders from police that appellant had the right to remain silent, appellant's first statement resulted when he persisted in attempting to exculpate himself by suggesting to detectives that he was present at the scene of the crime but did not participate in the actual murders. We reject appellant's argument that his remark, in the context in which it occurred, is subject to the interpretation that appellant was invoking his right to silence under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We find Edwards is not applicable under the facts of this case and that the trial judge properly admitted the challenged statements.
Walton I, 481 So.2d at 1199. Clearly, any claim regarding the admissibility of Walton's confession was raised and addressed in Walton I. Therefore, it is barred from relitigation in this collateral postconviction proceeding.
Even though this claim is certainly barred, it is clear that the Minnick and McNeil decisions only address the situation in which law enforcement officials initiate a conversation with a defendant after he has consulted with counsel. Indeed, in Minnick, the Court was specific:

Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided he has initiated the conversation or discussions with the authorities; but that is not the case before us. There can be no doubt that the interrogation in question was initiated by the police; it was a formal interview which petitioner was compelled to attend.
Minnick, 498 U.S. at 156, 111 S.Ct. 486; see also McNeil, 501 U.S. at 177, 111 S.Ct. 2204. The conversations at issue here were begun by Walton. Specifically, this Court noted that "[f]ollowing his apprehension, appellant initiated a conversation with detectives who were transporting him from *451 the courthouse to jail." Walton I, 481 So.2d at 1198 (emphasis supplied). Despite repeated reminders from the police that he had the right to remain silent, Walton "persisted in attempting to exculpate himself by suggesting to detectives that he was present at the scene of the crime but did not participate in the actual murders." Id. at 1199. Because the statements were initiated by Walton himself, Minnick and McNeil do not apply. As this claim was fully addressed by this Court in Walton I, and no grounds exist for a reexamination of the issue, we deny relief.
In his next claim for relief, Walton asserts that this Court erred in Walton II when it held that Walton's counsel initiated the submission of evidence regarding remorse for the killings, and that the transcripts of Walton's resentencing show that the State unconstitutionally introduced evidence regarding Walton's lack of remorse during his sentencing proceedings. Because lack of remorse may not be used as an aggravating factor, Walton contends that this Court should grant him a new penalty phase. Additionally, Walton asserts that his trial counsel was ineffective for failing to object to the State's submission of this evidence.
This precise claim was raised on the direct appeal of Walton's resentencing. There, we held:
In his second point, Walton argues that the state improperly presented evidence concerning lack of remorse as a nonstatutory aggravating circumstance. In response, the state asserts that Walton's counsel initiated the questioning of defense witnesses concerning remorse and expressly asked one witness "what if any remorse" had Walton shown, thus opening the door concerning this issue. This Court has consistently held that lack-of-remorse evidence cannot be presented by the state as an aggravating circumstance in its case in chief, see Robinson v. State, 520 So.2d 1 (Fla. 1988); Patterson v. State, 513 So.2d 1263 (Fla.1987); Pope v. State, 441 So.2d 1073 (Fla.1983); Jackson v. Wainwright, 421 So.2d 1385 (Fla.1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1412 (1983), but that does not mean the state is unable to present this evidence to rebut nonstatutory mitigating evidence of remorse presented by a defendant. See Agan v. State, 445 So.2d 326 (Fla.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984).
Walton II, 547 So.2d at 625. Walton, in a strikingly direct fashion, simply proceeds in his postconviction appeal to reargue the precise claim addressed by this Court in Walton II. Clearly, this type of reargument is improper, and this claim is barred. See Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla.1987) ("If [an] issue is raised on direct appeal, it will not be cognizable on collateral review."). Likewise, since this Court has held that the State's submission of evidence supporting a conclusion that Walton had no remorse for the killings was not wrongful, the lack of an objection from Walton's trial counsel does not evidence ineffective assistance of counsel.
Walton next contends that under rule 3.851, the signing of a death warrant by the governor unconstitutionally shortens the time period in which a death-sentenced defendant may file his rule 3.850 motion. In Cave v. State, 529 So.2d 293 (Fla.1988), we addressed this claim by stating:
Appellant presents one additional point. Under rule 3.850, appellant's conviction and sentence became final in early June 1986, when the United States Supreme Court denied certiorari review of Cave, our affirmance on direct appeal. *452 Burr v. State, 518 So.2d 903 (Fla.1987). Rule 3.850 prescribes a two-year period following final conviction for filing petitions for post-conviction relief, after which such petitions are procedurally barred. The Governor signed a death warrant on appellant on April 27, 1988, providing for execution during the week of July 6, 1988. Under these circumstances, Florida Rule of Criminal Procedure 3.851 requires that any post-conviction petitions be filed within thirty days of the signing of the warrant. Appellant filed his petition on May 27, 1988, which, he now claims, shortened by thirteen days his asserted right to a two-year period under rule 3.850. Essentially, appellant is claiming that procedural rule 3.850 prohibits the Governor of Florida from signing a death warrant until two years after a death sentence becomes final. This issue was not presented below and is procedurally barred. Moreover, this Court has no constitutional authority to abrogate the Governor's authority to issue death warrants on death sentenced prisoners whose convictions are final. Unless there is a petition for post-conviction relief, the affirmance of a final conviction ends the role of the courts. Rule 3.850 merely provides a time period after which petitions may not be filed. It does not act as a bar to execution of sentences immediately after they become final.
Cave, 529 So.2d at 298-99. Clearly, we have resolved this claim contrary to Walton's assertions, and must deny relief.
In the first independent claim of his supplemental rule 3.850 filings, Walton contends that the State withheld evidence revealing possible deception and a role in motivating the murders by Robin Fridella, in contravention of the dictates of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Walton contends that handwritten police notes from officer interviews, a police report relating the details of a civil disturbance which occurred between Robin and Stephen Fridella, and a polygraph examiner's handwritten notes from an examination of Robin were all suppressed by the State, and could have been used effectively by the defense at trial.
To establish a Brady violation, Walton must prove:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
Walton contends that the State wrongfully suppressed handwritten police notes and a domestic disturbance report which show the tumultuous relationship and hatred between Robin Fridella and Stephen Fridella. The handwritten notes created by an unidentified police officer indicate initial uncertainty in the murder investigation regarding Robin Fridella's veracity and possible involvement in the murders. Additionally, Walton argues that the State should have turned over a polygraph report indicating the possibility that Robin was not being entirely frank with the police investigating this crime. This evidence, Walton contends, could have been used by the defense to craft a different theory of defensein particular, it would have enabled Walton to assert that Robin was the mastermind who dominated him and encouraged the murders so that she could have sole custody of her child.
The court below addressed this claim by stating:

*453 The Court finds that Defendant fails to successfully assert a Brady violation. First, Defendant fails to demonstrate that the evidence presented at the evidentiary hearings was favorable to him. Assuming arguendo that Robin Fridella was more involved in planning the burglary/robbery and the murders, it would not have lessened Defendant's guilt in the guilt phase given the questionable admissibility of such evidence in the guilt phase.
Furthermore, the record is clear that Defendant was aware of the witness in question (his girlfriend), and more importantly, he knew the information about which she testified. Although the "due diligence requirement is absent from the Supreme Court's most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because evidence cannot be found to have been withheld from the defendant." Occhicone v. State, 768 So.2d 1037 (Fla.2000). Thus, the police officer's notes were not exculpatory, nor did they have any impeachment value. This is evidenced by defense attorney Donald O'Leary's testimony ... that although he would have expected to have received pursuant to Brady the information that the police had about Robin Fridella's custody problems in the divorce proceeding against her husband and that she had accused him of sleeping with another woman, he said it would not have been consistent with his theory of the defense and would, in his opinion, have actually been antagonistic.
... Mr. O'Leary said that the exhibits of which he had been made aware (the polygraph examiner's notes on Robin Fridella, the civil trespass report about Robin's custody dispute and the police officer's notes on Robin Fridella) would not have changed his strategy and that he was surprised they had not been used by the State against him because they would have added fuel to the fire that the murders were planned and premeditated....
In this case, the notes or documents to which Defendant alludes do not contain material information that would produce an acquittal or a life sentence on retrial. This Court acknowledges that the Florida Supreme Court has stated that attorney notes of witness interviews maintained by the State constitute Brady material. However, in this case, the notes were handwritten by a police officer, and the record affirmatively reflects that Defendant was aware of this witness (his girlfriend), and more importantly, he knew about the information to which she testified.
....
Thus, Defendant's Brady claim is without merit because there is no reasonable probability of a different outcome had the handwritten police notes been used by the defense at trial.
(Citations omitted.)
The trial court's conclusions are not clearly erroneous. Indeed, regardless of the dubious favorableness of this evidence to Walton,[8]Occhicone v. State, 768 So.2d 1037 (Fla.2000), holds that evidence known by a defendant cannot violate the precepts of Brady. According to Walton, the alleged usefulness of this evidence lies in revealing the troubled nature of Robin and Stephen Fridella's relationship, as well as the relationship between Robin Fridella and Walton before and after the time of *454 the murders. As noted by the court below:
Defendant's [pretrial] admissions to the police ... included that he was aware that Robin had a child custody hearing coming up and that they were fighting for the kids.... Defendant said that he was dating Robin at the time, that they were not living together, and that she had said something about going back to her husband, but that he did not believe they were planning on getting back together.
Clearly, Walton himself was fully informed of Robin Fridella's troubles with her husband, and he obviously was aware of the nature of his own relationship with Robin. Thus, under Occhicone, Walton's Brady claim "cannot stand [because he] knew of the evidence withheld or had possession of it, simply because the evidence cannot then be found to have been withheld" from him. 768 So.2d at 1042.
Even assuming that Occhicone is not dispositive here, Walton cannot prove that his case was prejudiced by the State's suppression of the identified evidence. To prevail, Walton must show that the evidence was material. See Way, 760 So.2d at 913. Evidence is material if it places "the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In the instant case, Walton has not shown that evidence revealing that his girlfriend at the time of the murders would have benefitted from the death of her husband undermines any confidence that Walton was properly convicted of murder and sentenced to death. Indeed, this evidence actually tends to support the State's primary prosecutorial theory that Walton carefully planned and carried out the instant murders. Walton's Brady claim must fail.
As a corollary to his Brady claim, Walton contends in his newly filed 3.850 appeal that the trial court failed to consider newly discovered evidence which shows that Walton was not the ringleader in the instant case, and was merely a bystander. Walton identifies various statements by codefendant Terry Van Royal in which Van Royal disavows earlier statements he made asserting that Walton was the mastermind or leader of the group committing the murders. Additionally, during the evidentiary hearing below, Walton introduced testimony from Ken Driggs and Elizabeth Wells, Capital Collateral Regional Counsel attorneys who interviewed codefendant Van Royal subsequent to the resentencing trial of Walton. They testified that Van Royal told them that Walton was not the leader of the group which killed the victims in the instant case, and that the murders were entirely unexpected. Walton contends that this information is newly discovered evidence which would probably produce a life sentence on retrial.
To justify the granting of a new trial on the basis of newly discovered evidence, Walton must first show that the evidence was unknown at the time of trial, and could not have been obtained at that time through due diligence. See Robinson v. State, 770 So.2d 1167, 1170 (Fla.2000). Once past this threshold finding, Walton must also show that the newly discovered evidence would "probably produce an acquittal on retrial." Id.
It is plain that Van Royal was available at the time of trial. He was available to be deposed, all parties were aware of his existence because he was a charged codefendant, and he gave multiple statements to the police which were available to counsel. What Walton has presented as "newly discovered evidence" is simply a new version *455 of the events from a witness/participant who has presented multiple stories since the time of the occurrence of the events themselves. As is clear from the testimony of attorneys Driggs and Wells, Van Royal was a very untrustworthy person when it came to providing the truth about the murders. Indeed, the following exchange and conclusion during the questioning of Ken Driggs evidences one instance of Van Royal's changing testimony:
Q: So you were aware that in December of 1999 that Mr. Van Royal testified in this courtroom that he said that Jason Walton had shot possibly two or three of the victims?
A: Recently I was made aware of that, yes, subsequent to the execution of my affidavit.
Q: Were you aware that he said in this courtroom, December of 1999, that he did not shoot anyone?
A: Yes
....
Q: So, I take it then, sir, that it would be fair to say that from the information you received, Mr. Van Royal has made a number of different statements that are difficult to reconcile?
A: That would appear to be the case.
Even if Van Royal's newest version of the events culminating in the murders qualifies as newly discovered evidence, it is obvious that this evidence is composed of statements made by an extremely untrustworthy person. If Van Royal's new statements were introduced into the current body of evidence in the instant casesubject to impeachment through introduction of prior inconsistent statementsits effect would likely be negligible. See Lightbourne v. State, 742 So.2d 238, 247 (1999) ("[R]ecanted testimony can be considered newly discovered evidence, but ... the trial court must examine all of the circumstances of the case.") (internal quotation marks omitted). Certainly, the trial court did not err in concluding that this evidence would not cause a different result if it were before a jury in a new resentencing proceeding.
Walton's set of claims asserting that his trial attorneys rendered constitutionally ineffective assistance deserves close examination. Walton contends, as part of both his initial and supplemental 3.850 motion filings, that his counsel failed to rebut the prosecution's assertions that he was the mastermind of the murders with evidence available through reasonable investigation, failed to object to the admission of evidence tending to prove Walton's involvement in drug transactions and use, mistakenly opened the door to the prosecution's admission of Walton's "rap sheet," failed to object to improper jury instructions, and failed to perform adequate investigation to obtain full materials to present as mitigating evidence.
As stated by this Court following the announcement of the United States Supreme Court's seminal decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), ineffective assistance of counsel claims are to be evaluated in the following fashion:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Importantly, a court considering *456 a claim of ineffectiveness of counsel "need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." Id.
Walton first contends that his counsel rendered ineffective assistance because he did not attempt to rebut the prosecution's arguments and evidence tending to show that Walton organized and led the robbery that ended in the murders here. In support of this assertion, Walton identifies certain statements made by the State's attorney during codefendant Cooper's trial in which the State argued that Cooper was not under the direction of Walton. In particular, Walton cites two statements during the prosecution's closing argument in which the State asserted that it was "absolutely ludicrous" to say that Walton was at fault for Cooper's actions, and there was no evidence to support the "incredible proposition" that Walton dominated Cooper during the crime.
The factual circumstances at issue here are quite similar to those presented in Fotopoulos v. State, 838 So.2d 1122 (Fla. 2002). In that case, Fotopoulos asserted that his trial counsel was deficient for not attempting to introduce a large amount of evidence and argument by the State from a codefendant's trial which tended to negate the prosecution's theory of domination and leadership of the crimes by the defendant. In Fotopoulos, we concluded that Fotopoulos had not demonstrated deficient performance by his trial counsel, despite the fact that he did not use the evidence admitted in a codefendant's trial. See Fotopoulos v. State, 838 So.2d at 1128-30.
When compared to the large amount of evidence not utilized by the defense in Fotopoulos, the two small statements ignored by trial counsel in the instant case are somewhat insignificant. Thus, under the reasoning recently adopted by this Court in Fotopoulos, Walton has failed to make the required showing to fulfill the Strickland performance prong. Additionally, Walton cannot show prejudice here. Evidence introduced at Walton's trial showed that Walton originated the plan to rob the victims on a rainy night, Walton armed the group prior to the robbery, and Walton was the only defendant involved who knew the location of the victims' house. See Walton II, 547 So.2d at 623-24. In the face of this overwhelming evidence, it is clear that the introduction of two statements by a state attorney in a codefendant's trial would not have been overly persuasive. Certainly, non-introduction of this evidence does not undermine our confidence in the outcome.
Next, Walton contends that his trial counsel deficiently failed to object to the State's admission of evidence showing that Walton had previously been involved in drug transactions and use. At trial, Walton's counsel attempted to prove the existence of the no significant history of prior criminal activity mitigator. In rebuttal, the State introduced evidence which supported its assertions that Walton had been involved in drug dealing; specifically, it introduced evidence that Walton sold marijuana, and that codefendant Cooper had been seen carrying a fifty-pound bale of marijuana towards Walton's home. See Walton II, 547 So.2d at 624. Walton now contends that trial counsel's failure to object to the admission of this evidence constitutes deficient performance.
This Court specifically addressed the admission of this evidence during the direct appeal of Walton's resentencing. In Walton II, this Court specifically held that this testimony was proper, stating: "Once a defendant claims that this mitigating circumstance is applicable, the state may rebut this claim with direct evidence of criminal *457 activity." Id. at 625. Because this Court has addressed this claim in a manner adverse to Walton's contentions here, his trial counsel's failure to contest the admissibility of this evidence cannot be deemed ineffective assistance. Additionally, Walton's assertion that his appellate counsel failed to raise this claim on direct appeal is positively refuted, as appellate counsel clearly fully litigated the issue before this Court. See id.
In a claim related to the issue raised above, Walton asserts that it was error for his trial counsel to attempt to show the existence of the no significant history of prior criminal activity mitigator here, because it opened the door for the State to introduce evidence of Walton's previous illegal conductincluding Walton's "rap sheet," which included a reference to an arrest and charge for theft of marijuana. Additionally, Walton contends that his counsel erred by not objecting to the rap sheet's admission into evidence.
Regardless of whether trial counsel's performance violated the first prong of the Strickland standard, it is absolutely clear that the jury's exposure to evidence of Walton's drug-related criminal activity could not have prejudiced him. The entirety of Walton's guilt and sentencing proceedings revolved around a factual scenario in which it was proven and uncontested that Walton had organized a group robbery to obtain drugs and money obtained through the sale of drugs. A foundational issue accepted as true at the resentencing was that Walton had participated in a robbery whose sole object was the procurement of drugs and cash. Certainly, the introduction of evidence showing that Walton had been involved in drug sales and thefts prior to the night of the murder was harmless, and when evaluated in the context of a trial which revolved entirely around Walton's attempt to forcibly obtain drugs, did not "so affect the fairness and reliability of the proceeding that confidence in the outcome is undermined." Maxwell v. Wainwright, 490 So.2d at 932.
Walton next contends that his trial counsel rendered constitutionally ineffective assistance by failing to object when the trial court instructed the jury that it "must" consider the aggravators related by the judge, but "may" consider the mitigators listed by the court. Walton asserted the claim that this instructional error was prejudicial on direct appeal of his resentencing, and it was decided adversely to him. See Walton II, 547 So.2d at 625-26 ("We find no fundamental error in the instructions. Taken as a whole, they demonstrate that the burden of proving the aggravating circumstances rested with the state."). Walton's attempt to resurrect the claim through an ineffective assistance of counsel claim is entirely improper. See Medina v. State, 573 So.2d 293, 295 (Fla. 1990) (holding that allegations of ineffective assistance cannot be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal).
In his final allegation of ineffective assistance, Walton contends that his trial counsel failed to adequately investigate for evidence which could have been used as proof of nonstatutory mitigation. During the resentencing, Walton's counsel presented three witnesses: a coworker, a childhood friend, and Walton's mother. At the evidentiary hearing below, Walton's trial counsel related his theory of the defense, stating:
The avenue of thought was pretty limited, and the theory of defense was that wethe road we went down was that this was, as far as my client was concerned, nothing more than a planned robbery gone bad, that he had divorced himself from that when it became apparent there were no goods to be had *458 goods, money, or drugsand that he was in the act of leaving, having abandoned the robbery, when the murders occurred.
During the postconviction hearings below, Walton introduced evidence through the testimony of his mother and sister that his home life as a child was awfulhe grew up in a single parent home, his mother engaged in promiscuous behavior in front of Walton and his siblings, his alcoholic stepfather often encouraged Walton to abuse drugs, and his stepfather subsequently choked to death in front of Walton when he was an adolescent. Evidence was also introduced which revealed that Walton had abused drugs as an adolescent and teenager, and had been enrolled in a radical therapy program which likely left him severely emotionally scarred, but which had not halted his continued abuse of illegal drugs.
Walton also introduced evidence during his postconviction hearings which raised questions regarding whether Robin Fridella, Walton's girlfriend and the wife of one of the victims at the time of the murders, may have played some role in the planning of the robbery and murders. Finally, Walton introduced the testimony of Bruce Jenkins, a friend of Walton's who explained that Walton's statement prior to the murder that he might be required to "waste" victim Stephen Fridella did not necessarily mean that he would kill him.
While it is clear that the evidence in mitigation illuminated during the postconviction proceedings below could have aided Walton's case before his resentencing jury, it is also absolutely clear that his trial counsel competently investigated for evidence in mitigation before trial. Walton's trial attorney, Donald O'Leary, stated that he asked Walton and his family members "every question [he] could think to draw out relevant information concerning Jason's background." Indeed, the record reflects that O'Leary performed extensive discovery prior to trial, and the following portion of the hearing transcript details the facts before O'Leary after the completion of his investigation:
Q: During that time [before trial] did you have rather extensive contact with the defendant, Jason Walton?
A: Yes.
Q: Okay. You met with him, talked with him, spent many hours with him?
A: Yes.
Q: And you also had a lot of contact with his mother and with other family members; did you not?
A: Yes.
Q: Okay. Now, I don't want to leave the impression that you just sat there in their presence waiting for them to say something. You asked them questions, didn't you?
A: Yes.
Q: You asked them every question you could think to draw out relevant information concerning Jason's background?
A: Yes.
Q: Some of them may have been general as opposed to specific correct?
A: Yes.
Q: But you did ask questions that ... you would have expected had Mrs. Walton known all about these drug problems, known about brain damage or known about head injuries, you asked sufficient questions that she should have answered those? She should have told you about those things?
A: In my own mind, yes.
Q: So you weren't just sitting there waiting for her to bring up these facts to you?
A: No sir.

*459 Q: You didn't expect her to decide what the issues might be, you asked questions that would give you relevant information?
A: Yes.
Q: Okay. And nobody told you anything about any of this?
A: No.
Q: Including your client, Mr. Walton?
A: Yes.
Q: And you made your decisions as to what evidence was going to be put on based upon the information that he gave you, correct?
A: Yes.
Clearly, O'Leary was entitled to rely upon the veracity of his client and his client's family. Walton's trial counsel made every effort to explore his client's childhood and family background. Every person he spoke withWalton's mother, coworkers, and other family membersrelated to him the same story. As O'Leary stated: "I kept getting this feedback that he was a normal, average, usual person, nonviolent, nonaggressive, average intelligence." The moderate alcohol and marijuana use revealed to Walton's attorney seemed to be "just what young boys, his peers in Marion county [did] on weekends." Our examination of the record before this Court leads us to conclude that Walton's trial attorney performed an adequate and thorough investigation for mitigating evidence before trial. Walton cannot be heard to complain now that his attorney failed to unearth evidence which Walton and his family affirmatively kept from counsel before trial.
In sum, there simply was no information before O'Leary at the time of Walton's resentencing which should have led him to investigate Walton's drug habits or mental state. A thorough investigation was performed, and O'Leary's performance certainly did not fall below "prevailing professional standards."
The second category of evidence identified by Walton in support of his claim that his attorney failed to conduct an adequate pretrial investigation, relating to the role of Robin Fridella and the testimony of Bruce Jenkins, does not warrant extended discussion. The record reveals that counsel attempted to contact and depose Bruce Jenkins, but was informed by the State that he was unavailable. As stated by O'Leary himself during the 3.850 hearing, it was hardly unreasonable for him to rely upon the representations of the State Attorney's Office that the police could not locate Jenkins. Certainly, his reliance upon the State was not outside "prevailing professional standards." See Maxwell, 490 So.2d at 932. Likewise, the only person in possession of information regarding Robin Fridella's possible role in the crimes at issue and her manipulative effect upon Walton was Walton himself. As O'Leary definitely consulted with Walton, and Walton did not reveal any of this information, O'Leary cannot be faulted.
Finally, Walton contends that the postconviction trial court erred when it improperly consolidated a hearing regarding codefendant Van Royal's recanted testimony by allowing counsel for codefendant Cooper to participate in the hearing and cross examine the witnesses. The record reveals that the trial court below held a joint hearing in which CCRC attorneys Driggs and Wells testified regarding their discussion with Van Royal. At that hearing, both Walton and Cooper were present and represented by counsel. In response to Walton's claim alleging improper joinder, the trial court held:
Regarding Defendant's allegation that an illegal consolidation of two (2) Postconviction cases occurred, this Court finds that it is without merit. The *460 Court merely held a joint hearing which included the same witnesses.... This was done in the interests of judicial economy to avoid conducting the same hearing twice. The joint hearing was legal because both codefendants Walton and Cooper were present, each with his own counsel, and each had the right to either present or cross-examine the witnesses on their individual considerations. Teffeteller v. Dugger, 676 So.2d 369 (Fla. 1996). Although Cooper's attorney objected at the beginning of such hearing regarding hearsay and relevancy, it is important to note that he withdrew his objection on the record during the proceeding.
It is plain from the record that the trial court did not consolidate the postconviction motions or proceedings of Walton and Cooper; moreover, Walton has not demonstrated any prejudice resulting from this joint hearing. Walton was afforded a full and fair opportunity to participate and elicit testimony from the witnesses, and has identified no prejudice. While this Court has mandated that postconviction proceedings may not be consolidated, see Teffeteller v. Dugger, 676 So.2d 369, 371 (Fla.1996); see generally Brown v. Wainwright, 392 So.2d 1327 (Fla.1981), there was no consolidation in the instant case, and no prejudice resulted from the joint hearing below. This claim is without merit.

Conclusion
Based upon the forgoing analysis, we affirm the trial court's denial of postconviction relief, and deny Walton's petition for a writ of habeas corpus.
It is so ordered.
ANSTEAD, C.J., WELLS and LEWIS, JJ., and SHAW, Senior Justice, concur.
PARIENTE, J., concurs in result only.
QUINCE, J., recused.
NOTES
[1] The substantive claims asserted in Walton's original 3.850 appeal were: (1) the jury received improper instructions regarding statutory aggravating circumstances; (2) the trial court erred in allowing a codefendant's mental health expert to testify at Walton's evidentiary hearing; (3) Walton was denied the effective assistance of counsel; (4) the trial court failed to independently weigh the aggravating and mitigating circumstances; (5) Walton's second sentencing proceeding was contaminated with the same evidence that was determined to have been inappropriately presented at his first sentencing proceeding; (6) Walton's sentence is devoid of a finding of his individual culpability; (7) Walton's sentence is disproportionate, disparate, and invalid because an equally culpable codefendant received a life sentence; (8) the jury was improperly instructed; (9) Walton's conviction should be reversed because new law now mandates a holding that his statements should have been suppressed; (10) Walton's absence from a portion of the proceedings prejudiced his resentencing; (11) Walton's death sentence rests upon the unconstitutional aggravating circumstance of lack of remorse; (12) the trial court unconstitutionally shifted the burden of proof in its instructions at sentencing; and (13) the application of Florida Rule of Criminal Procedure 3.851 violated Walton's constitutional rights.
[2] Walton's new postconviction claims are: (1) Walton was denied effective assistance of counsel when his attorney failed to adequately investigate and prepare for trial; (2) the State prejudiced Walton by withholding exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) Walton was denied his fundamental rights to confrontation, due process, and a reliable and individualized hearing when a codefendant's mental health expert testified as a witness for the State at the postconviction hearing; and (4) newly discovered evidence tending to show that Walton was not the leader of the group committing the murders at issue mandates a new trial.
[3] The claims raised in Walton's habeas petition are: (1) decisions issued by the U.S. Supreme Court following this Court's opinion on Walton's direct appeal mandate reconsideration of his original evidentiary claims; (2) Walton's sentence of death constitutes cruel and unusual punishment because the record is devoid of a finding of individual culpability; (3) the jury is required to make a unanimous finding, or at least a majority finding, as to the theory of prosecution to arrive at a capital conviction and death sentence; (4) the sentencing court failed to independently weigh aggravating and mitigating circumstances; (5) Walton's sentencing phase was tainted by the admission of evidence of collateral crimes; (6) the committed to avoid arrest aggravating circumstance was improperly applied in Walton's case; (7) Walton's sentence of death is unconstitutional because the penalty phase jury instructions shifted the burden of proof to Walton to prove that the death penalty should not apply; (8) it is constitutionally impermissible to use an underlying felony in a felony murder case as an aggravating circumstance; (9) Walton's sentencing jury was improperly instructed on the especially heinous, atrocious, or cruel aggravating circumstance ("HAC"); and (10) the cold, calculated, and premeditated aggravating circumstance ("CCP") is unconstitutional because it fails to genuinely narrow the class of persons eligible for the death penalty.
[4] As Walton's claim regarding public records was fully litigated below and has not been reasserted in this action, it is moot. Additionally, Walton's claim that he was unconstitutionally absent from a conference at which the charging of the jury was discussed is insufficiently pled and completely unsupported. As the burden of proof at the postconviction stage rests upon Walton, this claim must fail. See, e.g., Cave v. State, 529 So.2d 293, 297 (Fla.1988). Walton's contention that his prosecution on, and the jury's instruction regarding, alternative premeditated murder and felony murder theories was unconstitutional is also without merit. See Schad v. Arizona, 501 U.S. 624, 631-32, 636, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). Finally, Walton's claims relating to the constitutionality of Florida's death penalty schemethat Florida's death penalty statute shifts the burden to the capital defendant during the penalty phase, presumes that death is the appropriate punishment, and imposes an unconstitutional "automatic aggravator" when a defendant is prosecuted under a theory of felony murder have been rejected by this Court numerous times and are entirely devoid of merit. See, e.g., Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000); Banks v. State, 700 So.2d 363, 367 (Fla.1997).
[5] Walton asserts this claim in both his 3.850 postconviction appeal and his petition for writ of habeas corpus.
[6] Likewise, Walton's assertions that the sentencing order recites evidence outside the resentencing record is without merit, because evidence of Walton's active participation in the robbery and behavior while at the murder site was certainly before the court. See Walton II, 547 So.2d at 623-24.
[7] This phrase in the trial court's sentencing order is also cited by Walton in support of his claim that the trial court relied upon nonrecord material in sentencing him to death.
[8] As concluded by Walton's trial counsel, the evidence is largely inculpatory in nature.