# Supreme Court of Florida

_____

No. SC12-1760
_____

**DWIGHT T. EAGLIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-1785
_____

**DWIGHT T. EAGLIN,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 25, 2015]

PER CURIAM.

Dwight T. Eaglin, who was twenty-seven years old at the time of the crimes, was convicted and sentenced to death for the June 2003 murders of correctional officer Darla K. Lathrem and inmate Charles Fuston. Eaglin committed the

murders while attempting to escape from Charlotte Correctional Institution, where he was serving a life sentence for a prior murder. This Court affirmed his convictions and sentences on direct appeal. See Eaglin v. State, 19 So. 3d 935, 950 (Fla. 2009).

Eaglin now appeals the denial of his initial motion for postconviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.851, and simultaneously petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, §§ 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's denial of relief and deny Eaglin's petition for a writ of habeas corpus.

## FACTS AND PROCEDURAL HISTORY

On direct appeal, this Court summarized the facts of the crimes as follows:

> The evidence at trial established that in 2003, the Charlotte Correctional Institution was undergoing a renovation of the inmate dormitories. That same year, Eaglin, [Stephen] Smith, and [Michael] Jones, who were part of a group of inmates permitted to participate in the renovation process, began planning an escape attempt. With regard to the escape plans, the inmates constructed an escape ladder and a metal tool that would hook to the outer lights of the prison, but the tool was destroyed a month before the attempted escape. Eaglin blamed [the inmate victim, Charles] Fuston and John Beaston, another inmate, for destroying the tool.
> Two inmates, Kenneth Christopher Lykins and Jesse Baker, testified to what they heard about the escape plans. Lykins testified that he overheard Eaglin, Smith, and Jones talking about their upcoming escape. Specifically, Eaglin stated that he would kill Fuston before he left because "he didn't like the way he disrespected him." Lykins also overheard Eaglin state that he would kill anyone

- 2 -

who tried to stop him from doing what he was going to do. On cross-examination, Lykins, a twelve-time convicted felon, was impeached with an affidavit in which he denied knowing anything about the escape or the killing of Lathrem and Fuston. He explained this prior inconsistency by stating he had been concerned with his own safety.

Jesse Baker, another inmate and nine-time convicted felon, also testified to overhearing the escape plans. He specifically heard Eaglin, Smith, and Jones stating that "they would kill any bitch that got in their way." Further, Baker testified that Eaglin wanted to "straighten" Fuston, which indicated an intent to kill. Baker was impeached with the fact that he suffered from severe depression and was previously housed in the psychiatric dorm and the crisis unit of the prison.

Additional testimony from correctional officers working at the time of the escape attempt established that on June 11, 2003, Eaglin was observed attempting to jump on the outer-perimeter fence of the prison. When officers responded to the scene, Eaglin was sprayed with chemical agents and subdued. Thereafter, Officer Lathrem was found in a mop closet, huddled in a fetal position with injuries to her head area. A medium-sized sledgehammer was located near her body. Fuston was located in another cell lying on the floor with blood coming from underneath his head. He was unconscious but still breathing at that time. Beaston was found conscious in a secured cell with a large wound in the middle of his forehead. Beaston was the only surviving victim of the attacks.

The morning after the attempted escape, Eaglin was questioned regarding the murders. Eaglin stated he wanted the "chair," and that he "tried to kill those three people." Eaglin also admitted that he tried to "jump the fence."

With regard to the injuries suffered by the victims, the medical examiner, Dr. R. H. Imami, testified that Lathrem's injuries included a hemorrhage in her right eye, two injuries on the right side of her head, and injuries on her face. Dr. Imami found no evidence of defensive wounds or injuries and concluded that skull and brain injuries were the cause of Lathrem's death. The cause of these injuries was heavy, blunt force trauma. Dr. Imami opined that Lathrem was struck at least three times and that any of the blows would have caused her death. Finally, Dr. Imami stated that she believed the sledgehammer entered into evidence caused the injuries.

Dr. Imami also conducted the autopsy of Fuston. Fuston had injuries to the right and left sides of his face and head, the back of his head, and his mouth, in addition to skull fractures caused by blunt trauma. In total, Fuston suffered three to four fatal blows. Dr. Imami did not see typical defensive wounds but she observed a small skin scrape on the back of Fuston's left hand. She opined that the scrape could have been caused when he fell or during subsequent medical intervention. Ultimately, Dr. Imami concluded that skull and brain injuries by blunt-force trauma to the head were also the cause of Fuston's death and that the trauma was caused by a hammer.

Upon the testing of evidence obtained during the investigation of the murders, Lathrem's DNA was discovered on the sledgehammer that was near her body. Both Lathrem's and Fuston's DNA were located on the pants Eaglin wore on the day of the murder. Lathrem's DNA was also located on Eaglin's left boot. On cross-examination, defense counsel referred to earlier testimony of a corrections officer who testified that he assisted in removing Lathrem's body from the mop closet and then escorted Eaglin to the visiting park. The crime laboratory analyst conceded that this scenario presented the possibility of cross-contamination between Lathrem's blood and Eaglin's clothes. She also stated that she did not analyze every item sent to her but she matched the DNA profile of Lathrem to DNA found on codefendant Smith's right shoe.

The defense presented no witnesses but moved for a judgment of acquittal, which was denied by the court. The jury convicted Eaglin of the first-degree murders of Lathrem and Fuston.

Eaglin, 19 So. 3d at 939-40.

During the penalty phase, the State presented evidence of Eaglin's prior violent felony—first-degree murder with a sentence of life imprisonment without the possibility of parole. Id. at 940. He was serving this sentence at the time of the murders in this case. Id.

Prior to testifying during the penalty phase, Eaglin stated on the record that he did not want to present background mitigation evidence regarding his childhood

and that his counsel had decided not to present mental health mitigation—a decision with which Eaglin informed the trial court that he agreed. Id. at 945. Although Eaglin had informed counsel at the outset of the case that he did not want counsel to contact members of his family, counsel nonetheless undertook an investigation into Eaglin's background. Id.

Upon review of this potential mitigation, counsel ultimately agreed with Eaglin's decision not to present this information, explaining on the trial record that the presentation of mental health mitigation to the jury could be "dangerous," and stating during postconviction proceedings that Eaglin's background represented a "double-edged sword" that could adversely affect his case. Id. at 946. Instead, the theme of the defense's mitigation presentation was that the conditions at the correctional facility contributed to the occurrence of the crime, including inadequate supervision over construction, a failure in security staffing systems, and permitting inmate mobility. Id. at 940, 944 n.4.

Following the penalty phase, the jury recommended that Eaglin be sentenced to death by a vote of eight to four for each murder. After conducting a Spencer[1] hearing, the trial court entered its order sentencing Eaglin to death. Id. at 941. The trial court found that the following statutory aggravators applied to Eaglin's murder of Officer Lathrem: (1) the murder was committed by a person under

_____

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 5 -

sentence of imprisonment; (2) Eaglin had a prior violent felony conviction; (3) the murder was committed for the purpose of effecting an escape from custody; (4) the murder was cold, calculated, and premeditated (CCP); and (5) the victim was a law enforcement officer engaged in the performance of legal duties (merged with escape from custody). Id. With respect to Eaglin's murder of Fuston, the trial court found that the following statutory aggravators applied: (1) the murder was committed by a person under sentence of imprisonment; (2) Eaglin had a prior violent felony conviction; and (3) the murder was CCP. Id.

After reviewing a presentence investigation report (PSI), the trial court found in mitigation that "Eaglin suffered from a severely abusive childhood with a severely dysfunctional family." Id. The trial court assigned this mitigator some weight. Id. However, the trial court rejected the proposed mitigators stemming from the allegations of prison negligence. Id. Finding that the aggravators outweighed the mitigators, the trial court followed the jury's recommendation and sentenced Eaglin to death for both murders. Id. On direct appeal, this Court affirmed Eaglin's convictions and death sentences. Id. at 950.[2]

_____

2. Eaglin raised six issues on direct appeal, all of which this Court rejected: (1) the trial court erred in precluding defense counsel from impeaching a State witness; (2) the trial court erred in refusing to admit into penalty-phase evidence the videotape of an interview of a former guard trainee; (3) the jury and the trial court were not presented with available mitigation evidence, and the trial court failed to consider all mitigating evidence available in the record; (4) the trial court erred in using Eaglin's supposed lack of remorse against him in sentencing him to

Eaglin subsequently filed a timely initial motion for postconviction relief and an amended motion for postconviction relief, ultimately raising eleven claims.[3] Following a <u>Huff</u>[4] hearing, the postconviction court granted an evidentiary hearing on several of Eaglin's claims: (1) trial counsel were ineffective for failing to adequately advise Eaglin regarding his limited waiver of penalty-phase mitigation

death; (5) the trial court erred in giving an instruction on and finding the CCP aggravator; and (6) Florida's death penalty statute is unconstitutional. <u>Id.</u> at 941.

3. Eaglin's postconviction claims were as follows: (1) his constitutional rights were violated because he was denied access to public records; (2) requiring him to file his postconviction motion within one year after his conviction and sentence became final, as required by rule 3.851, violates due process and equal protection guarantees; (3) counsel were ineffective before trial and during the guilt phase of trial for (A) failing to argue, in the motion to suppress Eaglin's statements, that he was not capable of adequately understanding his <u>Miranda</u> rights and therefore did not knowingly, intelligently, and voluntarily waive those rights; (B) failing to move for a change of venue and failing to undertake voir dire of the jurors regarding publicity of the case during jury selection; and (C) failing to challenge the admissibility of scientific evidence and testimony; (4) counsel were ineffective for failing to adequately advise Eaglin regarding the nature, circumstances, and consequences of his limited waiver of penalty-phase mitigation and failing to advise the trial court of Eaglin's history of mental illness and non-compliance with necessary medication prior to the in-court colloquy; (5) counsel were ineffective for failing to adequately investigate and prepare mitigation evidence; (6) newly discovered evidence established that the forensic evidence presented by the State lacks scientific rigor; (7) Florida's lethal injection procedure constitutes cruel and unusual punishment; (8) the State's use of inconsistent and irreconcilable theories in order to obtain the death sentence was unconstitutional; (9) the combination of these errors constituted cumulative error; (10) Eaglin's convictions are unreliable because the State withheld exculpatory evidence; and (11) the appointment of Dr. Harry Krop as a confidential competency expert created a conflict of interest.

4. <u>Huff v. State</u>, 622 So. 2d 982 (Fla. 1993).

and failing to advise the trial court of his history of mental illness and non-compliance with necessary medication prior to an in-court colloquy; (2) trial counsel were ineffective for failing to adequately investigate and prepare mitigation evidence; and (3) trial counsel were ineffective during the guilt phase of trial for failing to argue that Eaglin was not capable of adequately understanding his Miranda[5] rights.

After the evidentiary hearing, the postconviction court denied Eaglin's amended motion for postconviction relief. This appeal follows, and Eaglin also petitions this Court for a writ of habeas corpus.

## ANALYSIS

### I.  Rule 3.851 Claims

On appeal to this Court, Eaglin raises three claims challenging the postconviction court's denial of relief. First, Eaglin asserts that his trial counsel were ineffective during the penalty phase. Second, Eaglin contends that he also received ineffective assistance of counsel during the guilt phase, pertaining to motions to suppress his inculpatory statements. Finally, Eaglin asserts that the postconviction court erred in summarily denying two of his postconviction claims.

### A.  Ineffective Assistance of Penalty-Phase Counsel

---

5.  Miranda v. Arizona, 384 U.S. 436 (1966).

In his first claim on appeal, Eaglin argues that trial counsel were ineffective during the penalty-phase proceedings based on two alleged errors. First, Eaglin contends that trial counsel were ineffective with respect to his statement that he did not wish to present background mitigation and that he agreed with counsel's strategic decision to not present mental health mitigation during the penalty phase. As part of this claim alleging that his waiver of mitigation was not knowing and voluntary, Eaglin contends both that the colloquy undertaken by the trial court did not satisfy the requirements articulated by this Court in Koon v. Dugger, 619 So. 2d 246 (Fla. 1993), and that counsel were ineffective in failing to inform the trial court that he had been diagnosed with bipolar disorder and was not medicated prior to the colloquy. Second, Eaglin argues that trial counsel were ineffective for failing to undertake an adequate investigation into his background and mental health history, and thereby could not adequately advise him regarding the presentation of this mitigation during the penalty phase. We address each aspect of this ineffective assistance of penalty-phase counsel claim in turn.

Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be

demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted)).

As to the second requirement of prejudice, this Court has explained:

With respect to those claims alleging ineffective assistance of counsel specifically during the penalty phase, penalty-phase prejudice under the Strickland standard is measured by "whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst [v. State, 18 So. 3d 975, 1013 (Fla. 2009)]. Under this standard, a defendant is not required "to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.'" Id. at 41 (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).

Wheeler v. State, 124 So. 3d 865, 873 (Fla. 2013).

"[T]his Court's standard of review is two pronged: (1) this Court must defer to the [trial] court's findings on factual issues so long as competent, substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs." Everett v. State, 54 So. 3d 464, 472 (Fla. 2010) (quoting Reed v. State, 875 So. 2d 415, 421-22 (Fla. 2004)). "Thus, under

- 10 -

<u>Strickland</u>, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's <u>factual</u> findings." <u>Stephens v. State</u>, 748 So. 2d 1028, 1033 (Fla. 1999).

### 1. Knowing & Voluntary Waiver of Mitigation

Eaglin's first argument involves the colloquy undertaken prior to penalty-phase testimony, during which Eaglin and his counsel informed the trial court that Eaglin did not wish to present mitigation evidence regarding his background and that counsel had made the strategic decision not to present mental health mitigation—a strategic decision with which Eaglin informed the trial court he agreed. Eaglin now asserts that his waiver was not knowing and voluntary because the trial court's colloquy did not comply with the requirements established by this Court in <u>Koon</u>, 619 So. 2d 246, and because counsel failed to advise the trial court of his mental illness and lack of medication.

As an initial matter, we reject Eaglin's argument pertaining to the adequacy of the <u>Koon</u> inquiry itself because this claim should have been raised on direct appeal. <u>See</u> <u>Spann v. State</u>, 857 So. 2d 845, 853-54 (Fla. 2003). Moreover, even if this claim was not procedurally barred, it would still be without merit because <u>Koon</u> is not applicable where the defendant does not waive all penalty-phase mitigation. <u>See</u> <u>Boyd v. State</u>, 910 So. 2d 167, 188 (Fla. 2005) ("[T]he requirements of <u>Koon</u> are not applicable in this case because [the defendant]

presented mitigating evidence."). As we recognized on direct appeal in rejecting Eaglin's claim that the trial court failed to consider all available mitigation in the record, this is not a case in which the defendant waived his right to present mitigation evidence. See Eaglin, 19 So. 3d at 945.

We also reject Eaglin's argument pertaining to counsel's performance during the colloquy, which the postconviction court denied after holding an evidentiary hearing. Specifically, Eaglin contends that counsel were aware that Dr. Harry Krop, a psychologist retained by the defense, had diagnosed Eaglin with bipolar disorder and that, as a result of this diagnosis, he was at a greater risk of suffering manic episodes, which he asserts directly affected his ability to have a rational understanding of the proceedings against him.

As noted by the postconviction court in denying this claim, however, trial counsel had no reason to question Eaglin's competency due to his bipolar diagnosis. Therefore, trial counsel's decision not to inform the trial court about his bipolar diagnosis and its effect on his competency prior to the colloquy cannot be deemed deficient. In fact, Eaglin recognizes that trial counsel were well aware of Eaglin's bipolar diagnosis prior to the penalty phase. Indeed, prior to the guilt phase of the trial, counsel had retained Dr. Krop to undertake an evaluation of Eaglin's mental health status.

Although Dr. Krop diagnosed Eaglin with bipolar disorder and antisocial personality disorder, he also informed counsel that he "did not feel that there was neuropsychological impairment" and that Eaglin was a "very intelligent individual." Intelligence testing undertaken by Dr. Krop prior to trial indicated that Eaglin had a full scale IQ score of 117. Additionally, Dr. Krop specifically testified during the postconviction evidentiary hearing that, based on his evaluation of Eaglin, he had no concerns regarding his competency, and counsel testified that they were aware of Dr. Krop's diagnoses.

Moreover, co-counsel Doug Withee testified that during the trial proceedings, Eaglin was "bright" and "alert" and that Withee "did not have any problem communicating with . . . Eaglin [and Eaglin] did not appear to have any problem communicating with [him]. [Eaglin] seemed to understand the whole picture." Co-counsel Neil McLoughlin supported Withee's impressions of Eaglin, stating that in his view Eaglin was competent and that there was "no good-faith basis" to undertake a competency evaluation.

Accordingly, Eaglin has not demonstrated that counsel's decision not to inform the trial court of his bipolar disorder and medication regime constituted deficient performance. We therefore conclude that this argument is without merit and reject Eaglin's claim.

2. Failure to Adequately Advise Eaglin Regarding Presentation of Background & Mental Health Mitigation Evidence

Eaglin's next argument is that trial counsel were ineffective for failing to properly advise him regarding the decision not to present background and mental health mitigation during the penalty phase. Specifically, Eaglin asserts that trial counsel did not undertake a meaningful investigation into these two categories of potentially mitigating evidence and therefore could not adequately advise him on the potential merit of presenting such evidence. Additionally, Eaglin argues that, although trial counsel may have undertaken some limited investigation into potential mitigation, counsel decided to present only the prison negligence mitigation before reviewing the results of this investigation. Moreover, Eaglin contends that counsel's strategy to pursue prison negligence mitigation evidence in lieu of "conventional" mitigation evidence was patently unreasonable.

Eaglin claims that, through several lay witnesses, he could have presented compelling mitigation evidence regarding his traumatic childhood and extensive head trauma that he suffered while boxing and playing football. In support, Eaglin called multiple lay witnesses at the postconviction evidentiary hearing. Although none of these witnesses testified during the penalty phase, each of them asserted that they were available and would have testified if they had been asked. Additionally, Eaglin argues that he could have presented compelling mental health mitigation. In support, Eaglin presented the testimony of numerous mental health

experts during the postconviction evidentiary hearing to explain the extent of his mental health problems, including alleged brain damage and bipolar disorder.

After reviewing the testimony presented at the evidentiary hearing, the postconviction court determined that trial counsel's investigation into Eaglin's potential background and mental health mitigation was adequate and that counsel's decision not to present this mitigation represented reasonable trial strategy. With respect to trial counsel's investigation, the postconviction court noted that "[t]he record reflects that the defense team visited [Eaglin's] mother, grandfather, and other family members, retained a defense mental health expert, and retained a mitigation specialist." The postconviction court concluded that trial counsel's decision not to present background or mental health mitigation was clear trial strategy, made after having adequately investigated Eaglin's background and mental health and with his complete agreement with that strategy at that time.

As to deficiency, the postconviction court concluded as follows:

> Merely because postconviction counsel has secured experts years after trial who have more favorable opinions does not establish that trial counsel was deficient for relying on the defense experts at the time of trial. Asay v. State, 769 So. 2d 974, 986 (Fla. 2000); Jones v. State, 732 So. 2d 313 (Fla. 1999). The information from Dr. Krop at the time of trial reveal[ed] no evidence of post concussive syndrome, seizures, or that Defendant's brain was not functioning normally. Rather, Dr. Krop found no neurological impairment. Trial counsel were not ineffective for relying on this information in formulating their trial strategy and deciding to focus on what they believed was the more effective mitigation evidence of negligence on the part of the Department of Corrections.

Regarding Eaglin's potential background mitigation, the postconviction court explained that Eaglin's mother left him when he was three years old and thus, "even had she been called to testify at trial, it is unlikely she would have been able to provide any information about [Eaglin] except his first year or so, and nothing about the rest of [his] life." The postconviction court also explained that, while Eaglin's brother would have been able to testify about the childhood abuse both he and Eaglin suffered, Eaglin "presented no testimony [at the postconviction evidentiary hearing] that [he] was negatively affected mentally by that abuse." In fact, Eaglin's brother affirmatively testified that "their abusive childhood did not result in [Eaglin] behaving erratically or unpredictably." The postconviction court concluded that "any potential mitigation evidence regarding [Eaglin's] abusive childhood . . . would have been countered in cross-examination by all the positive aspects of his life and his accomplishments in spite of enduring an abusive childhood."

Regarding Eaglin's potential mental health mitigation, the postconviction court explained that his "family and friends did not testify as to any obvious signs of mental illness or drastic mood changes, and that [Eaglin] did not report any such symptoms until he was arrested." The postconviction court observed that "the defense experts merely diagnosed [Eaglin] with bipolar disorder based on one prior diagnosis given without any supporting testing, and based solely on [Eaglin's] own

- 16 -

self-reporting." In addition, the postconviction court found significance in Eaglin's "inconsistencies in self reporting his symptoms to defense experts during postconviction evaluations."

Ultimately, the postconviction court determined that even if there was deficiency, there was no prejudice established. We agree. We do not address deficiency because it is clear that the prejudice component cannot be established even if counsel were deemed deficient. See Schoenwetter, 46 So. 3d at 546 ("A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." (quoting Maxwell, 490 So. 2d at 932)).

Even if counsel had presented testimony during the penalty phase that shed light on Eaglin's abusive childhood, his dysfunctional family, and that he suffered from mental health disorders, our confidence in the outcome of the penalty phase would not be undermined when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court. See Hurst, 18 So. 3d at 1013. Both of Eaglin's death sentences were supported by multiple aggravators, two of which—CCP and prior violent felony conviction—this Court has recognized as among the most serious aggravators under Florida's death penalty scheme. See Silvia v. State, 60 So. 3d 959, 974 (Fla. 2011). Further, the prior violent felony aggravator is especially significant in this case, given that

Eaglin was serving a life sentence for a prior murder when he committed the murders in this case.

In addition, although the jury did not hear information regarding Eaglin's childhood, the trial court considered his abusive childhood based on the PSI. In fact, the trial court found as a nonstatutory mitigator that "Eaglin suffered from a severely abusive childhood with a severely dysfunctional family." The trial court assigned this factor some weight, but still concluded that the numerous aggravators outweighed the mitigators. See Eaglin, 19 So. 3d at 941.

Accordingly, we conclude that any alleged failures of counsel during the penalty phase do not undermine confidence in the outcome of the penalty phase. We therefore affirm the postconviction court's denial of relief on this claim.

## B. Ineffective Assistance of Guilt-Phase Counsel

In his next claim, Eaglin asserts that trial counsel were ineffective during the guilt-phase proceedings for failing to effectively argue several motions to suppress statements Eaglin made to Florida Department of Law Enforcement Agent Uebelacker after his arrest. The statements at issue occurred on the morning of June 12, 2003, at Charlotte Correctional Institution, where Agent Uebelacker met Eaglin in an administrative office at the prison. When Eaglin entered the office, he made several unsolicited spontaneous statements to Agent Uebelacker, which

included references to wanting the electric chair and that Eaglin had "tried to kill those three people."

After Eaglin made these statements, Agent Uebelacker read Eaglin his Miranda rights. Then, after Eaglin stated that he understood his rights, Agent Uebelacker asked him if he would allow the interview to be recorded. In the recorded interview, Eaglin himself actually recited his Miranda rights for Agent Uebelacker without solicitation. To ensure that Eaglin understood his rights, Agent Uebelacker proceeded to read Eaglin his Miranda rights again. During the recorded interview, Eaglin stated that he "decided to jump the fence" and reiterated that he wanted "the chair."

Eaglin's trial counsel filed multiple motions to suppress the statements, arguing several theories of suppression, including a Miranda violation and lack of voluntariness. With respect to Eaglin's claim that his statements were not voluntary, counsel argued that Eaglin was unable to exercise free will because he suffered from lacerations on his arms, back, and legs; was sprayed with a chemical agent during the escape attempt; was kicked in the head; received minimal medical treatment; and had not slept for more than thirty hours. The trial court denied the motions to suppress.

In his postconviction claim, Eaglin argued that trial counsel were deficient in litigating the motions to suppress because counsel should have argued that a

- 19 -

bipolar "manic episode" rendered him incapable of knowingly and voluntarily waiving his <u>Miranda</u> rights. The postconviction court held an evidentiary hearing on this claim but ultimately denied it.

We conclude that the postconviction court did not err in denying this claim. Eaglin has not established either that trial counsel were deficient in litigating the motions to suppress or that raising the bipolar "manic episode" as a basis to suppress his statements would have resulted in the motions being granted.

In support of this claim, Eaglin relies on testimony elicited during the postconviction evidentiary hearing that demonstrated he may have been suffering from a bipolar "manic episode" at the time he met with Agent Uebelacker. Specifically, Eaglin points to the testimony of Dr. Philip Harvey, a clinical psychologist, who testified that it was his opinion that Eaglin was suffering from a bipolar "manic episode" at the time of the crimes and that bipolar "manic episodes" can last for several days. Dr. Harvey explained that suffering from a bipolar "manic episode" can affect an individual's judgment. This testimony was supported by Dr. David Pickar, a psychiatrist, who also testified at the postconviction evidentiary hearing that Eaglin was likely experiencing bipolar manic symptoms on the day of the murders.

However, as noted by the postconviction court, this testimony presented at the postconviction evidentiary hearing is contradicted by the evidence that was

presented during the trial proceedings regarding the motions to suppress. For example, a nurse at the correctional facility testified before the trial court that she observed Eaglin in a holding cell following his apprehension, and he was "alert and oriented, responding to her questions verbally." Eaglin also testified during a hearing on the motions to suppress, where he admitted that he had made the statements, that he had recited his rights during the recorded interview, and that he understood those rights.

Trial counsel litigated the motions to suppress at length, asserting multiple bases for suppression. Although Eaglin now contends that trial counsel were deficient in not raising his mental illness, his postconviction counsel did not question trial counsel during the evidentiary hearing regarding their strategy in litigating the motions to suppress or why the bipolar "manic episode" was not raised. While we disagree with the postconviction court's conclusion that this failure to specifically question trial counsel constituted a waiver of the claim, we agree with the postconviction court's conclusion that the evidence Eaglin did present fails to establish that he was incapable of understanding his Miranda rights. Eaglin has also failed to demonstrate how, even if the bipolar "manic episode" had been raised in litigating the motions to suppress, this would have resulted in the motions being granted. Accordingly, because Eaglin cannot demonstrate either deficiency or prejudice, we affirm the postconviction court's denial of this claim.

## C.  Summarily Denied Claims

Eaglin also asserts on appeal that the postconviction court erred in summarily denying two claims without holding an evidentiary hearing: (1) the State utilized inconsistent, irreconcilable, and misleading theories of prosecution in his trial and the trial of one of his codefendants, Stephen Smith; and (2) the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Because both of these claims are refuted by the record, we affirm the postconviction court's summary denial of these claims.

### 1.  The State's Use of Inconsistent Theories of Prosecution in Eaglin's Trial & in the Trial of Eaglin's Codefendant

Eaglin first asserts that the postconviction court erred in summarily denying his claim that the State utilized inconsistent theories in prosecuting Eaglin and codefendant Stephen Smith and thereby violated his due process rights.  Specifically, Eaglin argues that in Smith's trial, the State argued that Smith had been planning the escape for months and only brought Eaglin in as the "muscle" shortly before the escape attempt.  He also argues that Smith, who did not testify at Eaglin's trial, said in a recorded statement that was introduced at Smith's trial that there was no plan to kill inmate Fuston or whichever prison guard they encountered.  Eaglin asserts that in his trial, the State conversely portrayed him as the primary actor, which directly conflicts with the State's theory in Smith's trial.

Even if the use of inconsistent theories of prosecution could rise to the level of a due process violation, the postconviction court correctly concluded that the State presented consistent theories of prosecution in Eaglin's and Smith's trials. As noted by the postconviction court, "the State argued in Smith's case that Eaglin committed the murders, followed Smith's plan, and Smith was a principal. At [Eaglin's] trial, the State again argued [Eaglin] committed the murders." A review of the record supports the postconviction court's factual findings.

The fact that the State used consistent prosecution theories is further bolstered by the fact that the trial court in Smith's case stated that the State could not argue that Smith may have wielded the sledgehammer. Therefore, Eaglin's claim is refuted by the record, and the postconviction court did not err in summarily denying this claim.

2. The State Withheld Exculpatory Evidence from Eaglin in Violation of Brady

Eaglin next asserts that the postconviction court erred in summarily denying his claim that the State withheld exculpatory evidence from the defense in violation of Brady. Specifically, Eaglin asserts that the State failed to disclose to the defense that one of his other codefendants, Michael Jones, had been offered a plea agreement in exchange for his cooperation. Additionally, Eaglin contends that, as part of a plea agreement, the State Attorney's Office agreed that it would use its best efforts to have codefendant Jones incarcerated in a prison outside the

State of Florida and that letters between an assistant state attorney and the Florida Department of Corrections (DOC) regarding these efforts were not revealed. Eaglin claims he only learned of this information on May 20, 2011, upon postconviction counsel's review of Jones's 2008 court file at the Charlotte County Clerk's Office.

The record conclusively refutes this claim because the record demonstrates that on November 10, 2005, an assistant state attorney took proffered testimony from Jones while in the presence of Jones's counsel, and on December 22, 2005, the assistant state attorney provided a copy of Jones's proffered testimony to Eaglin's co-counsel Withee. At the outset of the proffer, the State made clear that the parties had not entered into a plea agreement. In the proffer, Jones discussed the escape attempt that occurred on the night of the murders, consistently implicating Eaglin in the escape attempt. Jones did not testify at Eaglin's trial, and Eaglin was subsequently convicted of the murders on March 31, 2006.

After Eaglin was convicted and sentenced to death, Jones subsequently entered into a plea agreement with the State in January 2007. In return, Jones would be sentenced to life in prison, and the State Attorney's Office would use its best efforts to encourage the DOC to allow Jones to serve his sentence outside the State of Florida. In Jones's plea colloquy, the State confirmed on the record that these were terms agreed to in the plea agreement.

In order to show a <u>Brady</u> violation, Eaglin must demonstrate that "(1) favorable evidence, either exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, [he] was prejudiced." <u>Johnson v. State</u>, 135 So. 3d 1002, 1027-28 (Fla. 2014).

With respect to Jones's proffer, the record refutes Eaglin's claim that this information was suppressed by the State. As noted by the postconviction court, a transcript of this proffer was provided to Eaglin's co-counsel Withee on December 22, 2005, months before Eaglin's trial. Similarly, Eaglin's claim that the State suppressed the terms of Jones's plea agreement, including that the State Attorney's Office would use its best efforts to ensure Jones served his sentence out of state, is refuted by the record in that the State agreed to the terms of the plea agreement in open court, during Jones's plea colloquy, which took place in January 2007.

Moreover, the record refutes Eaglin's assertion that the allegedly suppressed information constituted favorable evidence. The record shows that Jones's proffer, as well as the terms of the subsequent plea agreement, were not exculpatory. In his proffer, Jones consistently inculpated Eaglin in the escape attempt. Further, neither the proffer itself nor the terms of the plea agreement had any impeachment value, as Jones did not testify at Eaglin's trial and did not enter into the plea agreement until after Eaglin had already been convicted.

For all these reasons, we affirm the postconviction court's summary denial of this claim. We turn next to Eaglin's habeas corpus petition.

## II. Habeas Corpus Petition

In his habeas petition, Eaglin raises one issue—appellate counsel was ineffective for failing to identify and raise on direct appeal that an actual conflict of interest was created when the trial court appointed Dr. Krop to serve as a confidential competency expert for Eaglin's codefendant, Michael Jones. Eaglin asserts that Dr. Krop's appointment as a competency expert in Jones's case prejudiced his own case and that his appellate counsel was ineffective for failing to raise this claim on direct appeal. Eaglin also asserts that his appellate counsel was ineffective for failing to supplement the record with portions of the Jones trial transcript. We disagree.

In preparation for trial, Eaglin's counsel retained Dr. Krop on March 22, 2004, to undertake a mental health evaluation. Dr. Krop interviewed Eaglin, administered testing, and ultimately diagnosed him with bipolar disorder and antisocial personality disorder. Although trial counsel originally indicated that they intended to call Dr. Krop during the penalty-phase proceedings, counsel decided against presenting mental health mitigation, and Dr. Krop did not testify. Eaglin was ultimately sentenced to death on March 31, 2006, and he filed his notice of appeal in this Court on April 21, 2006.

Several months after the trial court had sentenced Eaglin to death and Eaglin had filed his notice of appeal, Jones attempted to enter into a plea agreement regarding the first-degree murder of the correctional officer killed during the escape attempt. However, the trial court did not initially accept Jones's plea and orally appointed Dr. Krop, along with two other doctors, to evaluate Jones's competency. Subsequently, in October 2006, the trial court issued a written order appointing Dr. Krop to undertake a competency evaluation in Jones's case. In accordance with this appointment, Dr. Krop undertook a competency evaluation of Jones, and the trial court ultimately accepted Jones's plea in January 2007.

Eaglin alleges that Dr. Krop's subsequent appointment as a competency expert in Jones's case created a conflict of interest due to the fact that he had previously served as a confidential mental health expert in Eaglin's case. Eaglin alleges that the conflict of interest is established by "the simple fact that he was working as a confidential psychologist for two codefendants with opposing interests." Based on this alleged conflict of interest, Eaglin asserts that the counsel he received was adversely affected. In seeking habeas corpus relief, Eaglin argues that appellate counsel's failure to raise this conflict of interest on direct appeal constituted ineffective assistance of counsel.

In support of his claim of ineffective assistance of appellate counsel, Eaglin relies on this Court's opinion in Walton v. State, 847 So. 2d 438, 445-46 (Fla.

2003), in which this Court stated that it was error for a <u>postconviction court</u> to allow a mental health expert to <u>testify</u> for the State at an evidentiary hearing where that expert had previously been appointed as a confidential mental health expert for a codefendant. This Court stated that, because the codefendants' interests were antagonistic, a conflict of interest existed, and it was unlikely that the expert could render a truly objective opinion. <u>Id.</u>

While Eaglin appears to analogize <u>Walton</u> to this case, <u>Walton</u> is completely inapposite. Unlike in <u>Walton</u>, Eaglin cannot establish any alleged conflict of interest that prejudiced his case, as Dr. Krop did not offer any testimony at Eaglin's trial and was only appointed to Jones's case after he had completed all work on Eaglin's case and after Eaglin was convicted and sentenced to death. Moreover, Dr. Krop, along with two other mental health experts, evaluated Jones only for competence and did not undertake any further investigation into Jones's mental health. Thus, Eaglin's reliance on <u>Walton</u> is misplaced, and his assertion that appellate counsel was ineffective for failing to raise this argument on direct appeal is unavailing.

Accordingly, appellate counsel cannot be deemed deficient for failing to raise this meritless issue on direct appeal, or for failing to supplement the record in order to facilitate presentation of this meritless claim. <u>See</u> <u>Jennings v. State</u>, 123 So. 3d 1101, 1124 (Fla. 2013) (holding that appellate counsel was not deficient for

failing to raise a meritless issue on appeal).  Therefore, we deny Eaglin's petition for habeas corpus relief.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's denial of relief, and we also deny Eaglin's petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Charlotte County,
        Christine Hissam Greider, Judge - Case No. 082003CF0015250001X
And an Original Proceeding – Habeas Corpus

Neal Andre Dupree, Capital Collateral Regional Counsel-South, William McKinley Hennis, III, Litigation Director, Capital Collateral Regional Counsel-South, and Elizabeth Tandiwe Stewart, Staff Attorney, Capital Collateral Regional Counsel-South, Fort Lauderdale, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stephen D. Ake, Assistant Attorney General, Tampa, Florida,

        for Appellee/Respondent